UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NORTH WIND CONSTRUCTION SERVICES, LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br><br>        v.<br><br>CAMPOS EPC, LLC, a Colorado limited liability company,<br><br><br>        Defendant. | Case No. 4:21-cv-00096-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are Plaintiff North Wind's Motion for Summary Judgment (Dkt. 41) and Motion to Exclude Expert Report and Testimony (Dkt. 57). The Court held oral argument on September 19, 2022, and took the motions under advisement. For the reasons below, the Court will DENY the Motion to Exclude, and GRANT IN PART and DENY IN PART the Motion for Summary Judgment.

## II. BACKGROUND

Plaintiff North Wind is a general contractor. Defendant Campos is an engineering firm that helps contractors estimate the costs of construction. In 2017, North Wind was considering submitting a bid to construct a water treatment facility for the Department of

Energy ("DOE") in Tennessee. Dkt. 41, at 2. To that end, it asked Campos to provide estimation services to help formulate its bid. North Wind asked Campos to "provide quantity take-offs[1] and estimates for structural concrete, soil excavation/backfill, and structural steel" for two major portions of the project: the Headworks Facility and the Treatment Facility. *Id.*

Campos submitted a proposal (the "Proposal") for scope of work that anticipated estimates for both facilities. North Wind returned the Proposal with markups handwritten on the back, detailing "scope limitations, including the deletion of the estimation of concrete necessary for the Headworks Facility." Dkt. 49, at 4. After some back-and-forth, North Wind sent Campos a contract (the "Agreement"), which Campos executed without requesting further changes. This Agreement specifically incorporated Campos' original Proposal, but not North Wind's markups to the Proposal. The Agreement also incorporated a set of general provisions, including a merger clause providing that the Agreement "supercede[s] all other writings" and that "[t]he parties shall not be bound by or be liable for any statement, representation, promise, inducement or understanding not set forth herein." Dkt. 41, at 5. These general provisions provided that Campos would "be responsible for the professional quality and technical accuracy" of its estimates. Dkt. 1, at 7.

---

[1] "A 'take-off' is a detailed breakdown of all components required to complete a construction project. It includes identification of each raw material needed for a project, and for each material the number of units, the unit price, and the total price . . . The final product of a construction take-off is the total material cost for a project." Dkt. 1, at 6.

Believing that North Wind's handwritten markups on the Proposal were "implicitly incorporated into the agreement," Campos understood that it was not responsible for estimating the structural concrete for the Headworks Facility. Dkt. 49, at 6. Thus, it estimated the amount of structural steel required, but not the amount of concrete. *Id*. at 4. The Headworks Facility estimate it finally submitted included two non-concrete line items, but no line item for concrete. In Campos' view, this "clearly indicated that no concrete was being estimated for this component." *Id.* North Wind read the estimate to mean that the Headworks Facility would require zero yards of structural concrete, not that Campos had intentionally skipped that portion of the estimate. Dkt. 1, at 9.

Both parties proceeded without asking the other for clarification. Campos, without confirming whether the markups were incorporated into the Agreement, moved on to other projects. North Wind, without pausing to wonder how a major headworks could be constructed without concrete, incorporated Campos' concrete-less estimates into its bid, which won the DOE contract. Dkt. 49, at 4; Dkt. 41–1, at 6.

When North Wind began soliciting subcontractors to source and pour the concrete for the Tennessee facility, it discovered that its bid had not accounted for as much concrete as the project required. Not only had its bid estimated zero concrete for the Headworks facility, but it had underestimated the amount of concrete needed for the Water Treatment Facility as well. North Wind asked its construction manager to figure out how much concrete would be required and asked its engineering team to retroactively evaluate Campos' estimates. Where Campos estimated the Treatment Facility would require 3,601 cubic yards of concrete, (Dkt. 1, at 9) North Wind calculated that it would require 4,672

MEMORANDUM DECISION AND ORDER - 3

cubic yards (Dkt. 41–1, at 7). Where Campos had not estimated concrete for the Headworks Facility at all, North Wind calculated that it would require 478 cubic yards.[2] *Id.*

North Wind raised the discrepancy with Campos and filed this lawsuit for breach of contract. North Wind alleges that Campos breached the Agreement by: (1) failing to estimate concrete for the Headworks Facility when the Agreement required it to, and (2) grossly underestimating the amount of concrete required for the Water Treatment facility, thus breaching the Agreement's requirement of "professional quality and technical accuracy." Dkt. 1, at 7.

At the close of discovery, North Wind filed a Motion for Summary Judgment on its breach of contract claim. Dkt. 41. In support of its motion, it attached an expert report from an engineer named Timothy Overman. Dkt. 41-10. Campos filed a Response (Dkt. 49) asserting various factual disputes and attached an expert report from an engineer named Myron Temchin (Dkt. 49-5). Temchin's Report argues that Campos' estimates were of professional quality and technically accurate within the guidelines of the Association for the Advancement of Cost Engineering ("AACE"), (*id.* at 20–35), and that North Wind mismanaged its estimating process, which caused errors and omissions in its bid to the DOE (*id.* at 37–40). North Wind then moved to exclude Temchin's report, (Dkt. 57), arguing that the Court should not consider it in ruling on the Motion for Summary Judgment.

---

[2] North Wind alleges that, once it raised the issue, Campos' Director of Estimating ran the numbers and confirmed that North Wind's calculations were correct, even finding that the Headworks Facility would require 490 cubic yards of concrete—more than North Wind's calculation. Dkt. 41-1, at 7.

MEMORANDUM DECISION AND ORDER - 4

## III. LEGAL STANDARD

### A.  Motion to Exclude Standard

The proper scope of expert opinions is governed by the well-known standard established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny, and now set forth in Rule 702 of the Federal Rules of Evidence. *See Moore v. Deer Valley Trucking, Inc.*, 2014 WL 4956241, at *1 (D. Idaho Oct. 2, 2014). Rule 702 establishes several requirements for admitting an expert opinion. First, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); Fed. R. Evid. 702. "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance*.*" *Id.* (cleaned up).

Second, the witness must be sufficiently qualified to render the opinion. *Id.* If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based on sufficient facts or data; (2) the opinion stems from reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The inquiry is a flexible one*. Primiano*, 598 F.3d at 564. Ultimately, a trial court must "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (cleaned up). "Although a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the

MEMORANDUM DECISION AND ORDER - 5

expert's conclusions or assume a factfinding role." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022).

Reliability and relevance must be distinguished from problems with expert opinions that amount to impeachment and thus do not warrant exclusion. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). "As *Daubert* confirmed, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. Wells*, 879 F.3d 900, 933 (9th Cir. 2018) (quoting *Daubert*, 509 U.S. at 596).

### A. Summary Judgment Standard

Summary judgment is appropriate when the moving party can show that, as to any claim or defense—or part of any claim or defense—"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Since the Dec. 1, 2010, amendment to Fed. R. Civ. P. 56, federal courts have repeatedly found that summary judgment may be requested not only on an entire claim or defense, but also on any part of a claim or defense. *Ridgeway v. Mon-Dak Trucking, Inc.*, 2012 WL 5380343, at *3 (D. Mont. Oct. 5, 2012), (cleaned up) (collecting cases and interpreting the advisory committee notes to the 2010 amendment).

One of the key purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Id.* It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248. Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The Court does not make credibility determinations at this stage of the litigation, as such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). In considering a motion for summary judgment, the Court must also "view[] the facts in the non-moving party's favor[.]" *Zetwick v. Cty. Of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

Yet the Court need not accept allegations by the non-moving party if such allegations are not supported by sufficient evidence. *Anderson*, 477 U.S. at 249. Instead, the nonmoving party "must go beyond the pleadings and by its own evidence 'set forth

specific facts showing that there is a genuine issue for trial.'" *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (noting the nonmoving party must "identify with particularity the evidence that precludes summary judgment"). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (cleaned up).

## IV. ANALYSIS

### A. Myron Temchin's Expert Report and Testimony

Because North Wind asked the Court not to consider Temchin's report in deciding the summary judgment motion, the Court begins with the Motion to Exclude. Temchin makes several arguments in his report. First, he argues that Campos's estimates were technically accurate, at least under the AACE guidelines, which Campos argues are the industry standard for technical accuracy. Next, he argues that North Wind mismanaged its bid pricing, and that this mismanagement caused the problems with the bid to the DOE, not Campos' estimates. Finally, Temchin offers examples of alleged mismanagement. In deciding whether the report is admissible, the Court must determine whether it is relevant and reliable. *See Primiano*, 598 F.3d at 563; Fed. R. Evid. 702.

#### 1. Relevance

An expert's report is relevant when it will help the trier of fact understand the evidence or determine a fact in issue. *Primiano*, 598 F.3d at 563; *see also Truckstop.Net, LLC v. Sprint Commc'ns Co., L.P.*, 537 F. Supp. 2d 1126, 1137 (D. Idaho 2008) (cleaned

up) (finding that extrinsic evidence like expert testimony may be useful in determining whether terms are used as industry terms of art).

Temchin's report is relevant. If, as it alleges, Campos' estimates were accurate within the meaning of the Agreement, then the estimates did not constitute a breach. And if North Wind's damages can be attributed to its own mismanagement rather than Campos' estimates, that attribution could materially affect the amount of damages North Wind is entitled to.

Further, Temchin's report is likely to help the trier of fact understand the evidence. This case involves a technical dispute between sophisticated engineering firms. It requires the trier of fact to have a basic understanding of how these firms operate, and Temchin's report offers this insight. *See, e.g.*, Dkt. 49-5, at 19 (explaining the review, validation, and documentation process); *id.* at 20–21 (defining key technical terms as they are used within the industry); *id*. at 23–26 (outlining industry best practices for estimating construction quantities and costs).

Temchin's report offers the trier of fact a means to decide a key factual issue: the meaning of "technical accuracy" and "professional quality" in the Agreement. The contract dispute here turns on the meaning of these ambiguous terms, both of which include adjectives suggesting they bear a professional, technical meaning distinct from their everyday definitions. Temchin's report helps to show how a professional in the cost estimating industry might use and understand those terms.

North Wind objects to certain statements in the report where Temchin allegedly offers legal conclusions. In general, an expert's opinion is not objectionable just because it

embraces an ultimate factual issue. *See* Fed. R. Evid 703(a). "That said, an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1058 (9th Cir. 2008) (cleaned up). Determining who breached a contract is an ultimate issue of law. *See United States for use & benefit of Mountain Utilities, Inc. v. Fid. & Deposit Co. of Maryland*, 2022 WL 1538707, at \*9 (D. Idaho May 16, 2022). In *Mountain Utilities*, this Court did not allow expert witnesses to testify at trial on issues of contract interpretation, including ultimate conclusions on whether a party breached. *Id.* Still, after finding that the experts were well qualified in their fields, that their opinions were based on sufficient facts and data, applied reliable principles and methods, and employed adequate reasoning, the Court declined to exclude any of their reports on *Daubert* grounds. *Id.*

Here, Temchin's report makes quasi-judicial statements like, "Campos has fully complied with the terms of its contract with North Wind," (Dkt. 49-5, at ¶ 22.1), and "based on the totality of these observations and findings, North Wind's claim is found to have no merit for cost recovery" (*id.* at ¶ 22.6). As in *Mountain Utilities*, Temchin could not properly offer these statements at trial, but if his report is otherwise relevant and helpful, they do not constitute grounds for excluding it in its totality at this stage. Because Temchin's legal conclusions would not affect the Court's analysis at summary judgment, and because they are a fit subject for a motion for limine before they reach a jury, they do not require the exclusion of the whole report.

North Wind further objects that Temchin improperly opines on Campos' state of mind or intent. Generally, experts may offer testimony about a person's state of mind in

civil cases. *See* Fed. R. Evid. 704(a)–(b). Courts may exclude such testimony if they find it unhelpful. *See, e.g.*, *Siring v. Or. State Bd. Of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (excluding expert testimony on intent, motive, or state of mind where "the expert was no more qualified than the jury" to draw inferences on those topics from the evidence).

Here, Temchin's report contains statements like, "Campos embraced . . . and relied on" collaboration with North Wind (*id.* at ¶ 61), or "[t]his made sense to Campos." (*id.* at ¶ 39.4). These statements do infer a business' intent, but they are not unhelpful to a trier of fact. Unlike the expert in *Siring*, who was no more qualified than the jury to draw inferences about intent or state of mind from the evidence, Temchin's close relationship with Campos makes him more-than-usually qualified to draw these inferences. Like Temchin's legal conclusions, these statements do not affect the Court's analysis at this stage and any negative effect they might have on a jury can be remedied with a motion in limine. They do not require the report to be excluded in its entirety.

Finally, North Wind argues that Temchin's report cannot be relevant because it relies on the AACE guidelines, which are not incorporated into the Agreement. The AACE guidelines need not be incorporated to be relevant. The Court reads Temchin's report to say, not that the AACE guidelines are part of the contract,[3] but that they are a useful touchstone for how practicing engineers and estimators understand terms like "technical accuracy" and "professional quality" in the course of business. As discussed, this opinion

---

[3] Campos makes this argument in its briefing, but Temchin does not.

is relevant because it could assist the finder of fact in interpreting these ambiguous terms.

2. *Reliability*

A witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based on sufficient facts or data, (2) the opinion emerges from reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93; *Kumho Tire*, 526 U.S. at 147. The inquiry is a flexible one. *Primiano*, 598 F.3d at 564.

Temchin is well-qualified in his field. His skill, experience, training, and education all qualify him as an expert on cost estimating processes. His report summarizes his qualifications:

> Mr. Temchin is President of JOULE, EPC a full-service engineering-procurement-construction (EPC) company providing recovery, reconstruction and reliability capital construction support services . . . . [He] is a professional registered Civil Engineer in multiple states with 50 years of management, execution and claims resolution EPC experience. He was the principal in charge on over $25 billion of capital improvement programs in the past 5 years and has a construction contractor's license in the State of California. He is an inactive member of the Association for Advancement of Cost Engineering, International (AACE). As Deputy Program Manager and Risk Manager for the Delta Conveyance Design & Construction Authority (DCDCA) of the California Department of Water Resources ($20 billion, 15-year Project)[,] Mr. Temchin authored a new DCDCA Cost Estimating Manual, Construction Services[,] in 2019.

Dkt. 49-5, at 3. The Court finds that this experience renders him well-qualified.

Further, Temchin's report is based on sufficient facts and data. To the extent it

involves data at all, the report considers the estimates Campos submitted, the actual quantities that North Wind believes the project will require, and the difference between those sums. For purposes of the pending Motion for Summary Judgment, which turns primarily on the meaning of contract terms—not the calculation of data—these facts are sufficient.

Finally, Temchin's report employs reliable principles and methods, which he applied reliably to the facts of the case. Though his report makes several points, its analytic thrust is that "Campos' quantity estimates . . . were prepared following industry Standards and Best Practice guidelines." Dkt. 49-5, at 4. He argues that the AACE would classify Campos' estimates as "Class 2 estimates," for which the industry standard of accuracy is "+20% to -15% of the calculated values." *Id.* at 6. He then argues that Campos' estimates, though imperfect, fell within that range. Temchin does not use a formal or rigorous scientific method. He simply asserts that the AACE guidelines are how working engineers would understand the contractual standard for accuracy, then compares Campos' estimates against the guidelines and concludes that, by that benchmark, they were professional and accurate.

North Wind argues that nobody has ever applied the AACE guidelines in the way Temchin does, and that this makes his method unreliable. It cites *Daubert* to argue that to be reliable, an expert witness's method must be tested—and ideally peer reviewed—so that its rate of error can be understood. As discussed, Temchin's report does not employ the kind of formal, rigorous methodology that the *Daubert* cases anticipated. Its only real method is to compare the estimates against a certain industry benchmark and conclude that

they are accurate by that measurement. The simple act of comparison is not a method that lends itself to peer review or generates a consistent rate of error. Its analytical simplicity does not, however, mean that it is inherently unreliable.[4] Upon careful review of the report, the Court is satisfied that Temchin's reasoning is not so tortured or farfetched that it would confuse the jury with junk science.

Finally, North Wind argues that the report cannot be reliable because Temchin's close ties with Campos make him biased in its favor. Problems with expert opinions that amount to impeachment do not warrant exclusion. *See City of Pomona*, 750 F.3d at 1044. Instead, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Wells*, 879 F.3d at 933 (cleaned up). If Temchin's opinion is colored by his close ties to Campos, that bias can be highlighted at trial. But bias is not a proper grounds for excluding expert testimony, particularly at the summary judgment stage.

Temchin's report satisfies the requirements of rule 702. Even if it were a close question, the primary motive behind the *Daubert* factors—concern about confusing juries with junk science—is not an issue at summary judgment. At this stage, there is no jury to confuse. Thus, North Wind's Motion to Exclude is DENIED.

---

[4] The entire American legal system, which functions by analogizing and distinguishing, would collapse if this kind of comparative reasoning was not considered reliable.

### B. Summary Judgment

#### 1. *Breach of Contract*

To win on a breach of contract claim, a plaintiff must show: (1) a contract existed, (2) the contract was breached, (3) the breach caused damages, and (4) the amount of the damages. *Mosell Equities, LLC v. Berryhill & Co.,* 297 P.3d 232, 241 (Idaho 2013). When a breach of contract claim does not involve any genuine issues of material fact, it is a question of law and may properly be resolved at the summary judgment stage. *Quality res. & Servs., Inc. v. Idaho Power Co.,* 706 F. Supp. 2d. 1088, 1094 (D. Idaho 2010). The Federal Rules of Civil Procedure allow courts to grant summary judgment on elements of a claim, even if genuine issues of material fact exist regarding other elements. *See Ridgeway*, 2012 WL 5380343, at *3.

##### a. Existence of a Contract

The threshold issue is whether an agreement exists. Whether there has been the necessary meeting of the minds to form a contract is generally a question of fact. *Vanderford Co. v. Knudson*, 249 P.3d 857, 865 (Idaho 2011). Without evidence of fraud or other wrongful behavior, a party who signs a written contract is presumed to know its contents and to assent to them. *Liebelt v. Liebelt*, 801 P.2d 52, 55 (Idaho Ct. App. 1990); *Bingham v. Holder*, 637 F.3d 1040, 1045 (9th Cir. 2011); *see also Irwin Rogers Ins. Agency, Inc. v. Murphy*, 833 P.2d 128, 131 (Idaho Ct. App. 1992) ("A party's failure to read a contract will not excuse his performance.").

Here, North Wind's Complaint asserts (Dkt. 1 ¶ 15), and Campos' answer admits (Dkt. 2 ¶ 15), that the parties entered a contract. This admission settles the issue: it is

undisputed that a contract bound the parties. In contradiction of its Answer, Campos'
Response to the Motion for Summary Judgment argues that a contract was not formed.
Because one party thought the Headworks Facility was included in the Agreement and the
other thought it was not, Campos alleges that there was a mutual mistake and the
Agreement did not accurately reflect the parties' intent. However, mutual mistake occurs
when, at the time of contracting, both parties share a misconception about a vital fact or
assumption on which they based their bargain. *See Bailey v. Ewing*, 671 P.2d 1099, 1101
(Idaho Ct. App. 1983). Here, the mistake that Campos alleges—that the parties were
confused about which terms were incorporated into the Agreement—is a mistake of law,
not a mutual mistake of fact or an incorrect assumption that undermines the purpose of the
Agreement. On these facts, mutual mistake is inapplicable.

Campos cites a 1966 Idaho Supreme Court case, *C. H. Leavell & Co. v. Grafe &
Assocs., Inc.*, 414 P.2d 873, 877, to argue that, when there is no meeting of the minds
between parties on the scope of work to be performed, no contract is formed. It asserts that
North Wind and Campos' confusion over the scope of the contract prevented its formation.
This case, however, does not support Campos' argument. In *C.H. Leavell*, the court held
that no contract existed because the subcontractor's acceptance did not match the
contractor's offer. By contrast, Campos signed the Agreement exactly as North Wind sent
it over, without requesting changes. Campos may have assumed that the instrument it
signed was not binding, or that it contained fewer terms than it actually did, but its failure
to understand the Agreement will not excuse its duty to perform under it. The parties may
dispute the meaning of the Agreement, but they have admitted its existence. Thus, there is

no genuine issue of material fact on the formation of a contract.

      b. <u>Breach</u>

      The second issue is whether Campos breached the Agreement, which necessarily requires interpreting its terms. North Wind claims that Campos breached in two ways: first, by failing to estimate structural concrete for the Headworks Facility, and second, by providing inaccurate estimates for the Treatment Facility. In its defense, Campos argues that the Agreement incorporated handwritten markups relieving it of the responsibility to make estimates for the Headworks Facility, and that its other estimates satisfied the contractual standards for professionalism and accuracy. Thus, the Court must determine whether (1) North Wind's handwritten markups on the Proposal were incorporated into the Agreement, and (2) whether Campos' estimates for the Headworks and Treatment Facilities satisfied the contractual standard for "professional quality and technical accuracy."

      *i.   The Incorporation of the Markups*

      North Wind argues that Campos breached the contract by failing to estimate structural concrete for the Headworks Facility. It is undisputed that Campos did not provide that estimate. The only question is whether the Agreement required it to. The parol evidence rule dictates when extrinsic evidence may be considered in interpreting a contract. Generally, this rule will not allow extrinsic evidence when "the writing is complete upon its face and unambiguous." *Posey v. Ford Motor Credit Co.*, 111 P.3d 162, 165 (Idaho Ct. App. 2005). When "a written contract contains a merger clause, [absent allegations of fraud or mistake] it is complete on its face," and no extrinsic evidence of prior negotiations or

conversations is admissible to "contradict, vary, alter, add to, or detract from the terms of the contract." *City of Meridian v. Petra Inc.,* 299 P.3d 232, 242 (Idaho 2013) (cleaned up). A merger clause establishes that the parties have agreed that the contract contains their entire agreement and proves the agreement is integrated. *Id.* "A signed agreement may incorporate by reference to another agreement, which is not signed by the parties, if the terms to be incorporated are adequately identified and readily available for inspection by the parties." *Id*. The parol evidence rule will not exclude documents that are expressly incorporated by reference into the contract. *Id*.

Here, it is undisputed that the Agreement expressly incorporated general provisions that contained a merger clause. It is also undisputed that the Agreement expressly incorporated Campos' Proposal, which anticipated estimating concrete for the Headworks Facility. As executed, the Agreement did not contain or reference North Wind's handwritten markups on the back of the Proposal. Because the Agreement expressly incorporated a merger clause, it is completely integrated.[5] Because the Agreement expressly incorporated the Proposal, which anticipated the creation of a concrete estimate for the Headworks Facility, the Agreement required this estimate. Because the Agreement did not expressly incorporate the handwritten markups on the Proposal, and because it was fully integrated, the Parol Evidence Rule prevents the Court from considering the markups in determining the Agreement's scope. For these reasons, the Court finds that the Agreement required Campos to estimate concrete for the Headworks Facility. Campos did

---

[5] The Court has considered Campos' assertion of mutual mistake and found that it was not proper. Thus, that assertion does not undermine the integration of the Agreement.

not provide that estimate. Thus, Campos breached the Agreement. The Court will GRANT summary judgment on this element as it relates to Campos' failure to estimate concrete for the Headworks Facility.

### ii. Professional Quality and Technical Accuracy

North Wind also argues that Campos breached the Agreement by submitting estimates so inaccurate that they fell short of the contractual standards of "professional quality and technical accuracy." The Agreement does not define these terms. Whether a contract's terms are ambiguous is a question of law. *Machado v. Ryan*, 280 P.3d 715, 720–21 (Idaho 2012). Interpretation of an ambiguous term is a question of fact. *Id.* "The determination of whether a contract is ambiguous on its face must be decided by giving the words or phrases used their ordinary meanings*." Shawver v. Huckleberry Estates, LLC*, 93 P.3d 685 (Idaho 2004). A contract term is ambiguous when it is reasonably subject to competing interpretations. *Kessler v. Tortoise Dev., Inc.*, 937 P.2d 417, 419 (Idaho 1997). A contract that is unambiguous on its face may contain latent ambiguities that only become apparent when applying the terms to the facts. *Simons v. Simons*, 11 P.3d 20, 24 (Idaho 2000).

The parol evidence rule will not exclude documents that are expressly incorporated by reference into the contract. *See City of Meridian,* 299 P.3d at 242. To be incorporated by reference, terms must be adequately identified and readily available for inspection by the parties. *Id.* When a contract term is ambiguous, parol evidence is admissible to determine the intent of the drafters. *See Simons*, 11 P.3d at 24.

MEMORANDUM DECISION AND ORDER - 19

Here, the Agreement provides that Campos will "be responsible for the professional quality and technical accuracy" of its estimates. Dkt. 1, at 7. These terms are not ambiguous on their face, but when applied to the facts of Campos' estimates, their meaning is reasonably subject to competing interpretations. The plain meaning of "professional quality" or "technical accuracy" is unclear because both terms have modifiers suggesting a special, professional definition beyond ordinary quality or accuracy. For these reasons, the terms are ambiguous.

North Wind does not offer a definition for the words. Campos argues that they should be understood in the context of the AACE guidelines, and has submitted an expert report arguing that, by those standards, Campos' estimates were both professional and technically accurate. According to Campos, these guidelines are incorporated into the Agreement. It argues that the Proposal, which is expressly incorporated into the Agreement, incorporated the DOE's Request for Proposal ("RFP"), and that the DOE's solicitation website (though not the RFP) accepts the AACE guidelines as the correct standard for accuracy. This chain of increasingly tenuous references is not enough to incorporate the AACE guidelines into the Agreement. Though they are readily available to the parties, they are not adequately identified in the Agreement and so have not satisfied *City of Meridian*'s test for incorporation. Still, though the guidelines are not incorporated, the parol evidence rule will not prevent their application in determining ambiguous terms.

The meaning of these terms—and whether Campos' estimates fell short of the obligation they create—is a question of fact for the jury. Unlike North Wind's first theory of breach, on which the Court granted summary judgment, this second theory of breach

MEMORANDUM DECISION AND ORDER - 20

involves material questions of fact. Whether Campos breached in this way, and whether its estimates caused North Wind damages, are questions for the jury.

     c. Damages

The final issue is whether Campos' breach caused North Wind damages, and if so, in what amount. The plaintiff bears the burden of showing that the defendant's breach caused it damages. *In re Ricks*, 433 B.R. 806, 826–27 (Bankr. D. Idaho 2010) (quoting *Griffith v. Clear Lakes Trout Co.*, 152 P.3d 604, 611 (Idaho 2007)). It must prove both amount and causation with reasonable certainty. *Id.* "The reasonable certainty standard requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation." *Id.* Summary judgment is inappropriate when genuine issues of material fact exist regarding whether a defendant could have mitigated its damages. *See Davis v. First Interstate Bank of Idaho, N.A.*, 765 P.2d 680, 682 (Idaho 1988) (finding that summary judgment was erroneously granted where there existed "a question of material fact, appropriate for resolution by a jury, as to whether plaintiffs exercised reasonable care to mitigate their damages").

Here, North Wind has submitted an expert report from Timothy Overman to establish its damages. Overman, a partner at HKA Global, used the drawings and specifications provided by the DOE to perform quantity take-offs, redoing Campos' estimates. By Overman's analysis, Campos underestimated concrete quantities by 1,307

yards, which caused North Wind damages of $1,631,173.[6] Campos rejects this estimate because it argues it is based on an inaccurate price for concrete. Overman's analysis relied on the price of concrete in North Wind's concrete subcontractor's bid. That bid was based on the price of concrete in 2021. Because the price of concrete has fluctuated since then, and will continue to fluctuate, Campos argues that a genuine issue of material fact exists regarding the quantity of damages. Further, because the project is not yet complete, Campos argues that it is too early to establish damages with certainty. North Wind counters that the fluctuating price of concrete and the status of the project are irrelevant because it has already hired a subcontractor to install the concrete. Because the cost is fixed by contract, it argues that its damages are fixed regardless of the market price of concrete or the project's incomplete status.

The contract North Wind executed in 2019 with its concrete subcontractor, which apparently fixes the price for both furnishing and installing all concrete for the project, is adequate to make its damages complete—unaffected by the fluctuation of concrete prices or the status of the project. Still, questions remain regarding causation. When Campos submitted its estimates for the Headworks Facility, the "materials" section included only two line items: one for washed bedding sand and another for granular filter material. Dkt. 1, at 84. There was no line item for structural concrete; only the lack of an estimate. A reasonable jury could find that North Wind created some of its own damages by interpreting this absence of an estimate to be an affirmative estimate of zero, and then

---

[6] In its Complaint, North Wind asserts damages of $2,278,393.12. Dkt. 1, at 10.

credulously folding that misinterpretation into its bid to the DOE. The jury could reasonably conclude that North Wind would not have incurred the damages it asserts if, before submitting its bid, it had stopped to wonder how the headworks of a major government installation could be built without any structural concrete. Further, Temchin's expert report asserts that a portion of North Wind's damages are due to its mismanagement of the bidding process. Because a genuine question of material fact exists regarding how Campos' breach caused North Wind's damages, summary judgment is inappropriate on this element.

In sum, to win summary judgment on its breach of contract claim, North Wind needed to show that it had a contract with Campos, that Campos breached that contract, and that the breach caused its reasonably certain damages. The Court finds that there was a contract between the parties and that Campos breached the Agreement by not estimating the amount of structural concrete required for the Headworks Facility.[7] A genuine question of material fact exists, however, regarding how extensively Campos' breach caused North Wind's damages. Thus, in its authority under Fed. R. Civ. P. 56(g), the Court finds that there was a contract between the parties, that Campos breached it by failing to estimate concrete for the Headworks Facility, and that North Wind's actual damages as asserted in Overman's Expert Report are fixed. The Court GRANTS partial summary judgment as to these elements only. As to all other elements of the breach of contract claim, the Court DENIES summary judgment.

---

[7] The Court does not find, at this time, that the accuracy of Campos' estimates also constituted a breach.

The Court next considers Campos' affirmative defenses.

### 2. Affirmative Defenses

#### a. Failure to State a Claim

Campos argues that North Wind's claims are barred for failure to state a claim upon which relief can be granted. This is not a proper affirmative defense. *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080,1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense"). Even if it were, North Wind has pleaded sufficient facts to state a plausible breach of contract claim. Because there is no genuine issue of material fact about the adequacy of North Wind's claim under Fed. R. Civ. P 8(a), the Court GRANTS summary judgment on this affirmative defense.

#### b. North Wind's Alleged Prior Breach

Campos argues that North Wind's claims are barred by its own prior material breach of the Agreement. It states that North Wind had certain obligations under the Agreement, including to solicit material, consumable, and subcontractor pricing and to review Campos' estimates, which it failed to perform, and that the resulting breach was so significant that it excused Campos' own performance. North Wind denies that it had a contractual obligation to solicit these types of pricing or to oversee the accuracy of Campos' bids. Dkt. 41-1, at 13.

The Agreement, which expressly incorporates a merger clause, also expressly incorporates Campos' Proposal, which says "[Campos] assumes the following: North Wind Construction Services to [sic] solicit material, consumable, and subcontractor

pricing" and "[North Wind] will be available for performing bid reviews." Dkt. 1, at 30. Because the Proposal is expressly incorporated into the Agreement, these clauses are legally part of the contract. Unlike the handwritten markups, which were not incorporated and so were excluded by the parol evidence rule, the Proposal was incorporated, and so its terms may be considered in interpreting the Agreement.

Still, the language of these clauses does not automatically create a contractual obligation. A contractual assumption is different from a binding contract term. At best, these clauses are ambiguous and require interpretation by the trier of fact. Further, North Wind claims that it did in fact solicit subcontractors. Whether its efforts satisfied whatever obligation these clauses create is another fact question. Thus, the Court DENIES summary judgment on this affirmative defense.

c. North Wind's Alleged Conduct

Campos alleges that "North Wind's claims are barred by its own conduct." Dkt. 2, at 7. North Wind points out that Campos pleaded no facts to support this defense and offered none in response to discovery requests, arguing that Campos has thus failed to give fair notice of the defense. *See Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979) (holding that an affirmative defense is insufficiently pleaded where it fails to provide the plaintiff with "fair notice of the defense."). Though Campos' Answer asserting these affirmative defenses (Dkt. 15, at 7) pleaded no supporting facts, Campos later clarified (Dkt. 49, at 17–18) that the conduct at issue was North Wind's failure to catch the "misses" in the estimates. As pleaded, this affirmative defense is essentially an assertion of comparative negligence, which Campos has already pleaded as a separate affirmative

defense. Redundancy aside, a reasonable jury could find that North Wind was partially responsible for the damages it asserts. Accordingly, the Court DENIES summary judgment on this affirmative defense.

d.  <u>Assumption of Risk</u>

Campos argues that North Wind's claims are "barred by the doctrine of assumption of risk." Dkt. 2, at 7.  Without express or oral consent, assumption of risk is not a valid defense under Idaho law. *Rountree v. Boise Baseball, LLC*, 296 P.3d 373, 380 (Idaho 2013). Here, because North Wind never expressly assumed the risk of inaccurate estimates, assumption of risk is unavailable to Campos as a defense. Campos argues that *Rountree*'s rejection of the defense in tort cases does not prevent its use in this breach of contract case. Though the dispute in *Rountree* arose from torts facts, the Idaho Supreme Court did not limit its holding to the torts context. *Id.* ("The sole issue here is whether, in light of *Salinas* and *Winn*, primary implied assumption of risk is a viable defense in Idaho. We reaffirm *Salinas*'s holding that assumption of the risk has no legal effect as a defense, except in instances of express written or oral consent. Thus, primary implied assumption of the risk is not a valid defense."). The Idaho Supreme Court listed only one exception to its holding. That exception was for express written or oral consent, not cases arising under contract law. The Court will not read an exception into *Rountree* that the *Rountree* court itself declined to write. Accordingly, assumption of risk is not an affirmative defense available to Campos. The Court GRANTS summary Judgment on this affirmative defense.

e. <u>Contributory or Comparative Responsibility</u>

Campos argues that North Wind's "damages, if any, were caused by North Wind's

own negligence or fault." Dkt. 2, at 8.  Comparative negligence is a statutory defense to tort claims. *See* Idaho R. Civ. P. 8(c)(1)(D) (listing "contributory or comparative responsibility" as an affirmative defense); Idaho Code Ann. § 6-801 (West) (listing negligence, gross negligence, and comparative responsibility as the comparative negligence statute's appropriate applications). Under Idaho law, affirmative defenses based in tort are unavailable in breach of contract cases. *Empire Lumber Co. v. Thermal-Dynamic Towers, Inc.*, 971 P.2d 1119, 1125 (Idaho 1998) citing *Richardson Assoc. v. Lincoln– Devore, Inc.*, 806 P.2d 790, 810 (Wyo. 1991) (holding that tort-based defenses are unavailable when the cause of action was based in contract, even if subjected to tort challenges); *Centric Corp. v. Drake Bldg. Corp.*, 726 P.2d 1047, 1054 (Wyo. 1986) ("A claim of defense arising out of tort concepts . . . is not available where the claim of the plaintiff is premised upon contract.").

Here, the only cause of action that North Wind raised in its Complaint is breach of contract.  Because this case turns on contract law, and the affirmative defense of comparative fault turns on tort law, comparative fault is inapplicable here. Campos argues that, by failing to review its estimates, North Wind engaged in active negligence and that tort defenses should therefore be available. In support, it cites *Baccus v. Ameripride Servs., Inc.*, which held that, though "the mere negligent breach or non-performance of a contract will not sustain an action sounding in tort," active negligence or misfeasance may support a tort action based on a breach of contract. 179 P.3d 309, 313 (Idaho 2008) (cleaned up). *Baccus* holds that a breach of contract may give rise to an offensive tort claim against one of the parties. It does not hold that, if an allegedly breaching party asserts that the plaintiff

engaged in active negligence, it may then employ tort defenses against a breach of contract claim. Campos misreads *Baccus* and incorrectly asserts tort defenses unavailable to it here. Thus, the Court GRANTS summary judgment on this affirmative defense.[8]

### f. Failure to Mitigate

Campos argues that North Wind failed to mitigate its damages and that any damages awarded should be reduced proportionally. The duty to mitigate "provides for a reduction in damages where a defendant proves that it would have been reasonable for the plaintiff to take steps to avoid the full extent of the damages caused by the defendant's actionable conduct." *McCormick Intern. USA, Inc. v. Shore*, 277 P.3d 367, 371 (Idaho 2012). "Whether it is reasonable to expect a plaintiff to perform specific acts of mitigation is a question of fact." *Id.* "The defendant bears the burden of proving that the proposed means of mitigation were reasonable under the circumstances." *Id.* Moreover, "when advancing a claim that the plaintiff failed to mitigate damages, the defendant must prove both that a means of mitigation existed and that the proposed course of mitigation would, in fact, have resulted in a reduction of the plaintiff's damages." *Id.* The reasonableness of the method selected by a plaintiff to minimize damages is a fact question. *Casey v. Nampa and Meridian Irr. Dist.*, 379 P.2d 409, 412 (Idaho 1963). "[I]f reasonable, the efforts need not be successful." *Davis v. First Interstate Bank of Idaho, N.A.*, 765 P.2d 680, 682 (Idaho 1988) (cleaned up).

---

[8] Though these tort affirmative defenses are improperly pleaded, the issue underlying them—whether North Wind is partially responsible for its own damages—remains live. Campos can argue that North Wind has failed to establish the causation of its damages without misappropriating affirmative defenses from tort law.

MEMORANDUM DECISION AND ORDER - 28

Here, Campos argues that North Wind failed to mitigate its damages because it did not: (1) collaborate with Campos, (2) provide Campos with relevant information for estimating the concrete for the headworks, (3) properly check Campos' work, (4) solicit bid estimates from multiple subcontractors, or (4) submit a change order to the DOE once it realized its bid did not accurately reflect the amount of concrete that would be required. "Had North Wind taken any of these steps," it argues, "it could have caught the omission of [the estimate for headworks concrete] sooner and potentially received more competitive bids for the concrete work that would lower the amount of damages it now claims." Dkt. 49, at 19. Both parties have submitted conflicting expert reports regarding what caused the inaccuracies in North Wind's bid to the DOE: North Wind's report argues that Campos "grossly underestimated the volume of concrete required to be installed," thus causing the damages. Dkt. 43-17, at 4. Campos' report blames North Wind's alleged mismanagement of the bidding process. Dkt. 39-5, at 37.

Whether it was reasonable for North Wind to mitigate, and whether the specific mitigative actions Campos suggests were reasonable, are questions of fact for the jury. Thus, a genuine issue of material fact exists regarding whether reasonable means of mitigation existed and, if so, whether employing them would have actually reduced North Wind's damages. The Court DENIES summary judgment on this affirmative defense.

## V. CONCLUSION

Because Temchin's report is relevant and reliable, the Court DENIES North Wind's Motion to Exclude and will give the report the weight it finds appropriate at this stage.

As for North Wind's Motion for Summary Judgment, the Court makes three findings as a matter of law. First, there was a contract between the parties. Second, Campos breached the Agreement by not estimating the amount of structural concrete required for the headworks facility. Third, North Wind's actual damages are fixed by the contract with its concrete subcontractor and are not subject to price fluctuation or the completion of the project. On those issues, the Court GRANTS Summary Judgment. As to all other elements of the breach of contract claim, the Court DENIES summary judgment.

As for Campos' Affirmative Defenses, the Court GRANTS summary judgment on three defenses: Failure to State a Claim, Assumption of Risk, and Contributory or Comparative Responsibility. The Court DENIES summary judgment on all other affirmative defenses.

## VI. ORDER

The Court HEREBY ORDERS:

1. North Wind's Motion to Exclude Expert Report and Testimony (Dkt. 57) is DENIED.

2. North Wind's Motion for Summary Judgment (Dkt. 41) is GRANTED IN PART and DENIED IN PART:

      i. Under Fed. R. Civ. P. 56(g), the Court finds that there was a contract between the parties, that Campos breached by failing to estimate concrete for the Headworks Facility, and that North Wind's damages

MEMORANDUM DECISION AND ORDER - 30

as asserted in Overman's Expert Report are fixed. The Court GRANTS partial summary judgment on those elements only.

ii.  The Court DENIES summary judgment on all other elements of the Breach of Contract Claim.

iii.  The Court GRANTS summary judgment on the following affirmative defenses:

  a. Failure to State a Claim;

  b. Assumption of Risk; and

  c. Contributory or Comparative Responsibility.

iv.  The Court DENIES summary judgment on all other affirmative defenses.

3.  The Court will schedule a telephonic scheduling conference as soon as practical to select a trial date for the remaining issues.

DATED: January 13, 2023

David C. Nye
Chief U.S. District Court Judge